IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

TAUG N. WALKER,
     Plaintiff,

vs.                         Case No.:  3:15cv179/LAC/EMT

OFFICER LARRY WILLIAMSON, et al.,
     Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Taug N. Walker ("Walker"), an inmate of the Florida Department of Corrections ("FDOC"), proceeds pro se and in forma pauperis in this action brought under 42 U.S.C. § 1983. Presently before the court is Defendants' Motion for Summary Judgment ("MSJ"), with supporting materials (ECF No. 120). Walker filed an Opposition to Defendants' Motion for Summary Judgment ("Opposition"), stating that he wishes to voluntarily dismiss two of the three remaining Defendants, Warden R. Comerford and Sergeant Mason (ECF No. 122). Walker opposes summary judgment as to Defendant Williamson (id.). Defendants filed a "Reply to, and Objection to, Plaintiff's Response to Defendants' Motion for Summary Judgment" ("Reply"), stating that they do not oppose Walker's voluntary dismissal of Defendants Comerford and Mason (ECF No. 123). Defendants contend that some of Walker's evidence is inadmissible on summary judgment, and the admissible evidence

demonstrates that Defendant Williamson is entitled to summary judgment in his favor (*id.*). Walker submitted a response to Defendants' reply (ECF No. 128).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N. D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B)(C); Fed. R. Civ. P. 72(b). After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that Defendants Comerford and Mason should be dismissed from this lawsuit, pursuant to Plaintiff's voluntary dismissal. With regard to Defendant Williamson, the undersigned recommends that Williamson's motion for summary judgment be granted.

## I. BACKGROUND AND INTRODUCTION

At all times relevant to this action, Walker was incarcerated at the Santa Rosa Annex (*see* Third Amended Complaint at 6–8). Officer Larry Williamson was a member of the security staff assigned to the Santa Rosa Annex (*see id.*). Walker claims that Officer Williamson was deliberately indifferent to his safety on November 25, 2014, by failing to properly search and handcuff Inmate Jeremy Battle in the Q-dormitory prior to escorting Battle to the dormitory's dayroom for group mental health counseling (*id.* at 6–10). Walker claims that Williamson's failure to properly search and handcuff Inmate Battle resulted in Walker's being cut with a sharp object by

Battle (*id.*).  Walker alleges Inmate Battle cut him approximately ten (10) times on his arm and rib cage (*id.*).  Walker alleges he suffered physical and emotional injuries as a result of the attack (*id.*).  Walker claims that Officer Williamson's failure to properly search and handcuff Inmate Battle violated the Eighth Amendment (*id.*).  Walker seeks compensatory and punitive damages (*id.* at 10).

Defendant Officer Williamson contends the undisputed facts demonstrate that he was not deliberately indifferent to a substantial risk to Walker's safety (ECF No. 120 at 25–27).  Officer Williamson further argues he is entitled to qualified immunity (*id.* at 27–28).  Officer Williamson additionally contends Walker is not entitled to the compensatory or punitive damages he seeks (*id.* at 28–33).

With respect to Defendants Comerford and Mason, the undersigned concludes that Walker's request for voluntary dismissal should be granted.  For this reason, the remainder of this Report will address only Walker's claim against Defendant Officer Williamson.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

In order to prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his or her case or present affirmative evidence that the nonmoving party will be unable to prove his or her case

at trial. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact. *See* Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004); *see also* Celotex Corp., 477 U.S. at 324. The nonmoving party must either point to evidence in the record or present additional

evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See* Celotex Corp., *supra*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

With regard to the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> . . . .
>
> **(4) Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set

out facts that would be admissible in evidence, and show that the affiant
or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010).

Facts asserted in hearsay statements which are not subject to a hearsay exception, and thus would not be admissible in evidence, are insufficient to show that a fact is genuinely disputed. "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." Jones v. UPS Ground Freight, 683 F.3d 1283, 1294 (11th Cir. 2012) (citing Pritchard v. S. Co. Servs., 92 F.3d 1130, 1135 (11th Cir. 1996)). If a fact cannot be presented in a form that would be admissible in evidence, it cannot be used for purposes of summary judgment. See Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999); see Fed. R. Civ. P. 56(c).

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment, or grant summary judgment if the moving party's motion and supporting materials—including the facts considered undisputed—show that the moving party is entitled to it. See Fed. R. Civ. P. 56(e)(2, 3) (2010).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him or her. *See* <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); <u>Jones v. Cannon</u>, 174 F.3d 1271, 1282 (11th Cir. 1999). Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove. *See* <u>Celotex Corp.</u>, 477 U.S. at 317. A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>Celotex Corp.</u>, 477 U.S. at 322.

B.    <u>Qualified Immunity</u>

"A successful section 1983 action requires that the plaintiff show [he] was deprived of a federal right by a person acting under color of state law." <u>Almand v. DeKalb Cnty.</u>, 103 F.3d 1510, 1513 (11th Cir. 1997). "A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state." <u>Griffin v. City of Opa-Locka</u>, 261 F.3d 1295, 1303 (11th Cir. 2001). The defense of qualified immunity shields government officials performing discretionary acts "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); <u>Hadley v. Gutierrez</u>, 526 F.3d 1324, 1329 (11th Cir. 2008).

"Under the qualified immunity doctrine, government officials performing discretionary functions are immune not just from liability, but from suit, unless the conduct which is the basis for suit violates clearly established federal statutory or constitutional rights of which a reasonable person would have known." <u>Sanders v. Howze</u>, 177 F.3d 1245, 1249 (11th Cir. 1999) (citing <u>Harlow</u>, 457 U.S. at 818). Qualified immunity protects all but the plainly incompetent or those who knowingly violate federal law; it does not extend to one who knew or reasonably should have known that his or her actions would violate the plaintiff's federal rights. *See* <u>Jones v. Fransen</u>, 857 F.3d 843, 851 (11th Cir. 2017) (citations and quotation marks omitted).

"Because qualified immunity is a defense not only from liability, but also from suit, it is important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citation omitted). "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." <u>Tolan v. Cotton</u>, — U.S. —, 134 S. Ct. 1861, 1865, 188 L. Ed. 2d 895 (2014). "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right. . . . The second . . . asks

whether the right in question was 'clearly established' at the time of the violation."
*Id.*, 134 S. Ct. at 1865–66 (citations, internal quotation marks, and alterations omitted)
(first ellipsis in original). The court has discretion to decide which question to address
first. *See* Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565
(2009).

"Qualified immunity gives government officials breathing room to make
reasonable but mistaken judgments about open legal questions." Ashcroft v. al–Kidd,
563 U.S. 731, 743, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011). As previously noted,
"[w]hen properly applied, it protects all but the plainly incompetent or those who
knowingly violate the law." *Id.* (internal quotation marks omitted). In part, this
defense recognizes the problems that government officials like correctional officers
face in performing their jobs in dynamic and sometimes perilous situations. It is also
designed to avoid excessive disruption of government services and to provide a direct
way to end insubstantial claims on summary judgment. *Id.*

The clearly established law requirement provides government officials with the
ability to anticipate what conduct will give rise to liability for a constitutional
violation. *See* Anderson v. Creighton, 483 U.S. 635, 646, 107 S. Ct. 3034, 97 L. Ed.
2d 523 (1987). To that end, when officials are acting within their discretionary
capacity, they "can know that they will not be held personally liable as long as their

actions are reasonable in light of current American law." *Id.* "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that <u>every</u> 'reasonable official would have understood that what he is doing violates that right.'" <u>Al-Kidd</u>, 563 U.S. at 741 (quoting <u>Anderson</u>, 483 U.S. at 640) (emphasis added). This imposes an objective standard, and that objective standard is "measured by reference to clearly established law." <u>Harlow</u>, 457 U.S. at 818.

Because this objective standard is fundamental to the qualified immunity defense, the district court, in ruling on a motion for summary judgment, should determine if the law was clearly established at the time the incident occurred. As the Supreme Court explained:

> If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful . . . . If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

<u>Harlow</u>, 457 U.S. at 818–19.

In this way, both government officials and citizens are protected. If the law is not clearly established, then the court should dismiss the case against the government

official. If the law was clearly established, then the claim against the government official should go forward, and summary judgment should be denied.

Authoritative judicial decisions may "establish broad principles of law" that are clearly applicable to the conduct at issue, and it may also be obvious from "explicit statutory or constitutional statements" that certain conduct is unconstitutional. Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1209 (11th Cir. 2007); *see also* Taylor v. Barkes, — U.S. —, 135 S. Ct. 2042, 2044, 192 L. Ed. 2d 78 (2015) ("We do not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate."). Furthermore, recognizing that the clearly established law question turns on the law at the time of the incident, the district court must consider the law "in light of the specific context of the case, not as a broad general proposition . . . ." Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). In other words, the facts of the case before the court must be materially similar to the facts in the precedent that clearly establishes the deprivation. *See* Merricks v. Adkisson, 785 F.3d 553, 559 (11th Cir. 2015) (citation omitted). To be clearly established, the precedent must give officials clear warning of unconstitutional conduct. *Id.*

In considering the law to do this analysis, the district court should compare the facts of the case before the court that allege a constitutional deprivation with those

cases that the party opposing the motion contends show the clearly established nature

of the law. As the Eleventh Circuit has explained:

> For qualified immunity purposes, a pre-existing precedent is materially similar to the circumstances facing the official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly situated official could believe that the factual differences between the precedent and the circumstances facing the official might make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent. Thus, every fact need not be identical. Minor variations in some facts (the precedent lacks arguably significant fact or contains an additional arguably significant fact not in the circumstances now facing the official) might be very important and, therefore, be able to make the circumstances facing an official materially different than the pre-existing precedents, leaving the law applicable—in the circumstances facing the official—not clearly established when the defendant acted.

Merricks, 785 F.3d at 559 (internal quotation marks omitted).

Earlier this year, the Supreme Court observed:

> In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. The Court has found this necessary both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial.

> Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined at a high level of generality. As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

White v. Pauly, — U.S. —, 137 S. Ct. 548, 551–52, 196 L. Ed. 2d 463 (2017)

(multiple citations, some quotation marks, and alterations omitted).

The court cannot consider just any case law to decide if a right was clearly

established. Only binding opinions from the United States Supreme Court, the

Eleventh Circuit Court of Appeals, and the highest court in the state where the action

is filed, can serve as precedent for this analysis. *See* McClish v. Nugent, 483 F.3d

1231, 1237 (11th Cir. 2007).

### C.    Eighth Amendment

Under the Eighth Amendment, "prison officials have a duty to protect prisoners

from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833,

114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (citations omitted); *see also* Caldwell v.

Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014); Rodriguez v. Sec'y for

the Dep't of Corr, 508 F.3d 611, 616–17 (11th Cir. 2007); Purcell ex. rel. Estate of

Morgan v. Toombs Cnty., Ga., 400 F.3d 1313, 1319 (11th Cir. 2005); Carter v.

Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003).

A prison official violates the Eighth Amendment "when a substantial risk of

serious harm, *of which the official is subjectively aware*, exists and the official does

not respond reasonably to the risk." Carter, 352 F.3d at (internal quotation marks

omitted) (alterations adopted) (emphasis added); *see also* Farmer, 511 U.S. at 828 ("A

prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."). To survive summary judgment on a deliberate indifference failure-to-protect claim, "a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendant's deliberate indifference to that risk; and (3) causation." Goodman v. Kimbrough, 718 F.3d 1325, 1331 (11th Cir. 2013) (internal quotation marks omitted).

"When examining the first element—a substantial risk of serious harm—the court uses an objective standard." Caldwell, 748 F.3d at 1099 (citation omitted).

The second element—deliberate indifference in the context of a failure to prevent harm—has a subjective and an objective component. *See* Caldwell, 748 F.3d at 1099. To satisfy the subjective component, a plaintiff must produce evidence that the defendant "actually (subjectively) knew that an inmate faced a substantial risk of serious harm." *Id.* (citing Rodriguez, 508 F.3d at 617). The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. "The known risk of injury must be a strong likelihood, rather than a mere possibility before a correctional officer's failure to act can constitute deliberate indifference." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990). The "risk calculation is a prospective determination of what might happen based upon events that have already

occurred." <u>Brooks v. Warden</u>, 800 F.3d 1295, 1301–02 (11th Cir. 2015). It does "not allow the advantage of hindsight to determine whether conditions of confinement amounted to 'cruel and unusual' punishment." *Id.* (quoting <u>Purcell</u>, 400 F.3d at 1320). Further, the claim requires the defendant to be subjectively aware "of a particularized threat or fear felt by [p]laintiff." <u>Carter</u>, 352 F.3d at 1350. The Eleventh Circuit has stated that:

> [a] prison official cannot avoid liability under the Eighth Amendment "by showing that . . . he did not know the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." [<u>Farmer</u>, 511 U.S.] at 843, 114 S. Ct. 1970. This is because "[t]he question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" *Id.* (quoting <u>Helling v. McKinney</u>, 509 U.S. 25, 35, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993)).

<u>Rodriguez</u>, 508 F.3d at 617. Thus, it does not matter "whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." <u>Farmer</u>, 511 U.S. at 843.

> If, for example, prison officials were aware that inmate rape was so common and uncontrolled that some potential victims dared not sleep but instead . . . would leave their beds and spend the night clinging to the bars nearest the guards' station, it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom.

<u>Farmer</u>, 511 U.S. at 843 (quotations, alterations, and citations omitted).

Whether a prison official had the requisite awareness of the risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." <u>Farmer</u>, 511 U.S. at 842 (citation omitted).  At the same time, the deliberate indifference standard—and the subjective awareness required by it—is far more onerous than normal tort-based standards of conduct sounding in negligence.  <u>Goodman v. Kimbrough</u>, 718 F.3d 1325, 1332 (11th Cir. 2013) (citation omitted).

To satisfy the objective component of the deliberate indifference element, a plaintiff must produce evidence that the defendant "disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner." <u>Rodriguez</u>, 508 F.3d at 617.

Prison officials may escape liability on a deliberate indifference claim if they show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.  *See* <u>Farmer</u>, 511 U.S. at 844.  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned

as the infliction of punishment" and does not give rise to a constitutional violation. *Id.* at 838.

## III.    EVIDENTIARY RULINGS ON SUMMARY JUDGMENT MATERIALS

Defendants lodged objections to some of the evidentiary materials submitted by Walker in opposition to Defendants' motion for summary judgment (*see* ECF No. 123).    Only four of Defendants' objections require a ruling from the court, specifically, the admissibility of the following:  (1) an alleged statement by Officer Williamson that he overheard an alleged statement by Walker's attacker, Inmate Battle; (2) an alleged statement by Inmate Battle to Walker; (3) a Declaration of Dortanio Hughley; and (4) evidence of subsequent measures adopted at Santa Rosa Correctional Institution ("Santa Rosa C.I.") with regard to the search and restraint of inmates housed in Q-dormitory prior to escorting them from their cells (*see* ECF No. 123 at 3–10).

### A.    Alleged Statement by Officer Williamson that He Overheard an Alleged Statement by Inmate Battle

Walker states in his Declaration in opposition to Defendants' motion for summary judgment, that after Inmate Battle attacked him during group counseling in the dayroom, he heard Officer Williamson say, "Earlier in the morning before the incident happened, I heard Inmate Battle tell someone that he was going to beat

someone up and there is going to be blood everywhere but I thought he was playing because I heard him laughing." (Declaration of Taug Walker ¶ 18, ECF No. 122, Ex. B).

Defendants contend Inmate Battle's part of the alleged statement is hearsay, which Walker cannot support by admissible evidence (ECF No. 123 at 7–8). Defendants submitted Inmate Battle's Declaration, in which he states he never made these statements or similar statements (Declaration of Jeremy Battle ¶ 7, ECF No. 123-3).

Hearsay is a statement that a party offers to prove the truth of the matter asserted in the statement. *See* Fed. R. Evid. 801(c). Hearsay within hearsay is excluded by the hearsay rule unless each part of the combined statements conforms with an exception to the rule. *See* Fed. R. Evid. 805. Here, as Defendants acknowledge, Officer Williamson's part (that he heard Inmate Battle say something) is not hearsay, because it a statement by a party opponent. *See* Fed. R. Evid. R. 801(d)(2).

Walker offers Battle's statement to prove that Officer Williamson was subjectively aware that Battle posed a particularized, substantial risk of serious harm to other inmates on November 25, 2014. To the extent Battle's statement is offered for that purpose, and not for the truth of Battle's statement, the statement may be

considered for the limited purpose of proving Officer Williamson's subjective awareness.

> B.      Alleged Statement by Inmate Battle to Walker

Walker alleges after Inmate Battle attacked him, Battle screamed out of his cell, "I was watching you the whole time you arrived here, snitch.  You didn't know it, stupid.  They must have wanted me to kill you."

Defendants submitted Inmate Battle's Declaration, in which he states he never made these statements or similar statements (Battle Decl. ¶ 7).

Walker is offering Inmate Battle's statements to prove the truth of the matters asserted in the statements, that is, that prison officials knew that Battle posed a substantial risk of serious harm to Walker.  Inmate Battle's alleged statement is thus hearsay.  *See* Fed. R. Evid. 801(c).  Walker has not shown that the statement qualifies under any exception to the hearsay rule.  *See* Fed. R. Evid. 803, 804, 807. Additionally, it is obvious that Inmate Battle's statement cannot be reduced to admissible form at trial, since Battle denies making it.  Therefore, Inmate Battle's alleged statement may not be considered on summary judgment.

> C.      Declaration of Dortanio Hughley

Walker submitted a declaration of Inmate Dortanio Hughley, in which Hughley states the following:

> I was talking with Officer Larry Williamson about inmates talking trash to each other.  Officer Larry Williamson said, "I don't see how ya'll talk crazy to each other.  In Q-dorm, we don't search inmates when they come out their [sic] cells, so over there you don't hear a lot of inmates arguing because they don't want to get stabbed up."

(Declaration of Dortanio Hughley, ECF No. 122, Ex. G).  Hughley states he was on Close Management status when Williamson made this statement (*id.*).  Hughley also states that Williamson made the statement after Williamson heard Hughley and another inmate arguing (*id.*).

Defendants submitted an FDOC record of Inmate Hughley's internal movements within the FDOC from October 30, 2014 to May 11, 2015 (Declaration of Larry Williamson ¶ 6, Attach. 1, ECF No. 123-1).  Inmate Hughley was housed at Santa Rosa C.I. from November 25, 2014 to April 7, 2015 (Williamson Decl. ¶ 5, Attach. 1).  Santa Rosa C.I. includes the Santa Rosa C.I.–Main Unit, Santa Rosa Annex, and Santa Rosa Work Camp (Williamson Decl. ¶ 1).  Hughley was housed at the Santa Rosa C.I.–Main Unit for the entirety of his stay (Williamson Decl. ¶ 5, Attach. 1).  Hughley was never housed at the Santa Rosa Annex during that time (*id.*).  Defendants submitted evidence that Officer Williamson was assigned only to the Santa Rosa Annex during that period, and was not assigned to the Santa Rosa C.I.–Main Unit (Williamson Dec. ¶ 7; Declaration of Micha Neal ¶¶ 1–4, Attach. 1).  Defendants contend the FDOC records "blatantly contradict" Inmate Hughley's

statement that he spoke with Officer Williamson; therefore, Hughley's statements may not be considered in ruling on their motion for summary judgment (ECF No. 123 at 9–10) (citing Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")).

The Scott case, upon which Defendants rely, was a § 1983 action against a county deputy and others, alleging use of excessive force during a high-speed chase. 550 U.S. at 374. A videotape captured the events underlying excessive force claim. Id. at 378. The videotape "quite clearly contradict[ed]" the version of the story told by the motorist. Id. The Supreme Court determined that the motorist's version of events was "so utterly discredited by the [videotape] that no reasonable jury could have believed him." Id. at 380. The Supreme Court held that the court "should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." Id. at 380–81.

Inmate Hughley's statement is not excludable on the basis argued by Defendants. The FDOC records do not constitute as complete a record on the factual issue presented here (i.e., whether Inmate Hughley and Officer Williamson had a conversation during Hughley's stint at Santa Rosa C.I.) as the videotape in Scott.

Without additional evidence of the level of contact, if any, between officers assigned to the Annex and inmates housed in the Main Unit, the court cannot say that the record "blatantly contradicts" Inmate Hughley's statement that he and Officer Williamson spoke during Hughley's incarceration at Santa Rosa C.I. Therefore, the court will consider Inmate Hughley's statement for purposes of ruling on Defendants' motion for summary judgment.

> D.  Evidence of Subsequent Search and Restraint Measures

Walker offers evidence that after Inmate Battle attacked him, the officers involved in the incident were counseled regarding the proper application of restraints and the necessity of performing cursory pat searches prior to escorting an inmate within the dormitory (Walker Decl. ¶ 19). Walker also offers evidence that after the incident, officers changed their handcuffing procedures (*id.*,¶ 20). Walker offers this evidence to prove that manner in which Officer Williamson searched and restrained Inmate Battle prior to Battle's escort to group counseling constituted deliberate indifference to a substantial risk to Walker's safety.

Defendants contend Walker's Eighth Amendment claim is about prior notice of a particularized, substantial risk of serious harm to an inmate (ECF No. 123 at 8–9). They contends subsequent remedial measures are irrelevant and thus inadmissible to

a deliberate indifference claims, pursuant to Rule 407 of the Federal Rules of Evidence (*id.*).

When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct. *See* Fed. R. Evid. 407.  Therefore, the court will not consider Walker's evidence that after Inmate Battle attacked him, the officers involved in the incident were counseled regarding the proper application of restraints and the necessity of performing cursory pat searches prior to escorting an inmate within the dormitory, and officers changed their handcuffing procedures.

## IV.    MATERIAL FACTS FOR PURPOSES OF SUMMARY JUDGMENT

As this case comes before the court on Officer Williamson's motion for summary judgment, the court is required to view the facts in the light most favorable to Walker, the nonmoving party. *See* Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993).  The court does so here, referring to Walker's verified Third Amended Complaint (ECF No. 66) and taking those facts from the parties' pleadings and summary judgment materials of record. *See* Perry v. Thompson, 786 F.2d 1093, 1095 (11th Cir. 1986) (holding that specific facts pled in a sworn complaint must be considered in opposition to summary judgment); Fed. R. Civ. P. 56(c); N.D. Fla. Loc. R. 56.1(B), (C), (F).  Nevertheless, the court observes that what

are stated as "facts" herein for purposes of summary judgment review may not be the

actual facts. *See* Montoute v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).

Upon Walker's arrival at Santa Rosa Annex on November 20, 2014, he was

housed in the Q-dormitory, Quad 2 (Third Amended Complaint at 6; Internal

Movements as of 07/13/17, ECF No. 120-1). Q-dormitory is the mental health unit

at Santa Rosa Annex, and houses Close Management inmates temporarily assigned

to the Crisis Stabilization Unit ("CSU") and Transitional Care Unit ("TCU")

(Declaration of Charles Mason ¶ 3, ECF No. 120-5).

CSU is defined as:

> a level of care that is less restrictive and intensive than care provided in
> a corrections mental health treatment facility that includes a broad range
> of evaluation and treatment services provided within a highly structured
> residential setting. It is intended for inmates who are experiencing
> debilitating symptoms of acute mental impairment and who cannot be
> adequately evaluated and treated in a transitional care unit or in infirmary
> mental health care. Such treatment is also more intensive than in
> transitional care units as it is devoted principally toward rapid
> stabilization of acute symptoms and conditions.

Fla. Admin. Code r. 33-404.103(6).

TCU is defined as:

> a level of care that is more intensive than outpatient and infirmary care
> but less intensive than crisis stabilization care, characterized by the
> provision of mental health treatment in the context of a structured
> residential setting. Transitional mental health care is indicated for a
> person with chronic or residual symptomology who does not require

crisis stabilization care or placement in a corrections mental health treatment facility but whose impairment in functioning nevertheless renders him or her incapable of adaptive functioning within the incarceration environment.

Fla. Admin. Code r. 33-403.103(8).

Officer Williamson knew that it was common for inmates in Q-dormitory to cut themselves (Officer Williamson's Answer to Walker's Interrogatories No. 8, ECF No. 122, Ex. A).

Inmate Jeremy Battle was also housed in Q-dormitory. According to Walker, Inmate Battle is a gang member, and the two of them had a history that predated their incarceration in the FDOC (Third Amended Complaint at 6). Walker states he is "a victim to" Inmate Battle, and that Battle "is doing part of his sentence for" him (Walker) (*id.*).

Walker and Inmate Battle were on Close Management status on November 25, 2014 (Walker Dec. ¶ 5). Close Management inmates are inmates that have shown that they are a safety and security risk to others by showing, through their behavior, an inability to live in the general population without abusing the rights and privileges of others (Declaration of Richard Comerford Decl. ¶ 5, ECF No. 120-3). There are three levels of Close Management—CM I, CM II, and CM III (*id.*).

On November 25, 2014, Walker and other inmates from Quad 2 attended a mental health group counseling session, which began at approximately 1330 hours (1:30 p.m.), in the Quad 4 dayroom of Q-dormitory (Mason Decl. ¶¶ 4, 6, 8). At that time, the published FDOC policy governing restraint and escort of Close Management inmates included the following provisions:

(14) Restraint and Escort Requirements.

(a) CMI.

1. Prior to opening a cell for any purpose, including exercise, health care or disciplinary call-outs, telephone calls, recreation, and visiting, the inmate shall be handcuffed behind his or her back. If documented medical conditions require that the inmate be handcuffed in front, waist chains will be used in addition to the handcuffs and the escort officers shall be particularly vigilant.

2. A minimum of two officers shall be physically present at the cell whenever the cell door is opened.

3. Prior to escorting an inmate from a cell the inmate shall be thoroughly searched.

(b) CMII. The same restraints and escort requirements as provided for CMI inmates above apply to CMII inmates with the exception that the senior correctional officer shall be authorized to approve unrestrained participation in group and individual counseling, dayroom access, and inside work assignments.

(c) CMIII. Unless precluded by specific safety and security concerns, CMIII inmates shall be escorted within the unit and to exercise areas attached to the unit as well as to all program and privilege activity participation without restraints. The warden shall base any

determination to require restraints on the security and safety needs of his or her individual institution and CM unit.

(d) Due to the unique mission of close management units, it is understood that more than one inmate may be out of his or her cell within the unit at any one time. However, whenever inmates are being escorted in restraints, there shall be one officer with each inmate and the inmates shall be kept at a distance from each other which would preclude any unauthorized physical contact.

(*see* Walker's Opposition to Defendants' Motion for Summary Judgment at 3 (citing Fla. Admin. Code r. 33-601.800(14)(a)–(d) (effective 03-06-14 to present)).

Defendants submitted, under seal, evidence of the FDOC's search and restraint duties and responsibilities of Close Management Officers (FDOC Post Orders, ECF No. 118). The Post Orders (dated September of 2013 and July of 2014) include the same search and restraint requirements as the FDOC public policy set forth *supra*.[1] Both the FDOC public policy and the Post Orders provide that an acceptable alternative to handcuffing an inmate behind the back is to handcuff the inmate in front with a waist chain and "black box." Both the FDOC public policy and the Post Orders also require that an inmate be "thoroughly searched" prior to escorting an inmate from a cell, but neither policy specifies a pat search in addition to the in-cell strip search.

---

[1] The Post Orders include more detail regarding how officers are to accomplish the application of restraints, including instructing inmates how to position themselves and visually inspecting the cell and inmate(s) to ascertain if there is any immediate danger, but those details are not relevant to the issues presented by Walker in this case.

Case No.: 3:15cv179/LAC/EMT

Defendants also submitted evidence of search and restraint policies specific to Santa Rosa C.I. According to Colonel John F. Kolodziej, on November 18, 2014, he issued a memorandum to all Santa Rosa C.I. staff instructing that as of that date, officers were prohibited from restraining inmates behind the back with a black box, and instead were required to restrain inmates in front with the black box (Declaration of Colonel John F. Kolodziej ¶ 5, Attach. 2; ECF No. 120-4). The black box is a handcuff cover that protects the key hole, is positioned between the wrists over the lock apparatus, prevents the prisoner from picking or tampering with any parts of the lock, and places the inmate's hands in a parallel position (Kolodziej Decl. ¶ 4).

Defendants also submitted evidence of search and restraint policies specific to Q-dormitory in the Santa Rosa Annex. According to Warden Richard Comerford, the search of an inmate housed in Q-dormitory prior to an inmate's exit from his cell for in-dormitory activities involved the following procedures: the officer would strip search the inmate by having the inmate remove all of his clothing and pass the clothing through the cell's rectangular food flap; the officer would visually inspect the inmate and search the inmate's clothing and then pass the clothing back to the inmate through the food flap; the inmate would dress, and the officer would restrain the inmate through the rectangular food flap by placing handcuffs and a waist chain and black box in front of the inmate's body; the cell door would be opened with a

minimum of two officers at the cell door; and an officer would escort the inmate to the in-dormitory activity (Declaration of Warden Richard Comerford ¶ 8, ECF No. 120-3).  Pat searches were not required when searching inmates prior to escorting them to the dayroom for group counseling on November 25, 2014 (*id.*).

According to Officer Williamson, he complies with all applicable escort and search procedures when he escorts and/or searches inmates (Williamson Decl. ¶ 4). In preparation for Inmate Battle's escort to group counseling on November 25, 2014, Officer Williamson strip searched Inmate Battle (*see* Walker Decl. ¶¶ 6–10; Williamson Decl. ¶ 4).[2]  After Officer Williamson strip searched Battle, he was summoned away from Battle's cell to speak with Sergeant Mason (the dormitory sergeant) and Officer Barlow (Walker Dep. 50:10–14, 51:9–11, 52:3–4, 52:16–25). Officer Williamson was away from Inmate Battle's cell for 2–3 minutes (Walker Dep. 51:4–6).  Williamson returned to Battle's cell, removed Battle from the cell, and

---

[2] Walker does not dispute that Inmate Battle removed his clothing and handed it to Officer Williamson; nor does Walker dispute that Williamson searched Battle's clothing (Deposition of Taug Walker 50:8–10, 54:20–55:11, Apr. 28, 2017, ECF No. 120-6).  Walker admits that from his vantage point, he could not see whether Officer Williamson visually inspected Battle's cell and the unclothed Battle (Walker Dep. 55:12–20); therefore, Walker lacks personal knowledge of whether Williamson did so.  In light of Officer Williamson's declaration that he complies with all applicable escort and search procedures, Walker has failed to show a genuine issue of material fact as to whether Williamson visually inspected Inmate Battle and his cell as part of the strip search.

Case No.:  3:15cv179/LAC/EMT

allowed him to be escorted to group counseling without re-searching him (Walker Decl. ¶¶ 10, 11).

During group counseling, Inmate Battle grabbed Walker's shirt and arm and started cutting Walker with a sharp object (Third Amended Complaint at 6; Walker Decl. ¶ 13). According to the videotape from the fixed wing camera in the dormitory, the altercation began at approximately 13:53:59 hours (Fixed Wing Video, ECF No. 123, Ex. K, ECF No. 127; Comerford Decl. ¶ 4). Officers responded immediately and attempted to separate Walker and Battle (*id.*). Officers finished separating Walker and Battle at 13:54:14 hours, approximately 15 seconds after the altercation began (*id.*).

Walker was taken to the medical department and examined by Licensed Practical Nurse C. Bryan (Third Amended Complaint at 6–7; Declaration of Albert Carl Maier, M.D. ¶¶ 5–6, ECF No. 120-8, attached FDOC Emergency Room Record, ECF No. 120-8 at 29–30). LPN Bryan noted the following injuries on the Emergency Room Record: (1) a superficial laceration approximately 4 centimeters in length to Walker's right antecubital (the inner or front surface of the forearm), (2) a superficial scratch on Walker's right arm, (3) a superficial scratch on Walker's right oblique (the area below the rib cage and above the abdomen), and (4) an abrasion on the left side of Walker's neck with no break in his skin (Dr. Maier Decl. ¶¶ 5–6, attached FDOC Emergency Room Record). Walker told LPN Bryan that he had no wounds other than

those indicated on the Emergency Room Record (*see id.*). The only medical treatment that was necessary and provided on November 25, 2014, was wound cleaning, steristrips and a gauze bandage to the injury on Walker's right forearm, and topical ointment to the injury on Walker's right oblique (Dr. Maier Decl. ¶ 6). Walker did not seek any follow-up care for anything related to the November 25, 2014 altercation (*id.*). According to Dr. Maier, if a non-prisoner incurred the injuries that Walker incurred, it would not be necessary to go to an emergency room; instead all injuries could be treated with products readily available at a corner drug store (*id.* ¶ 7). Walker states he suffered approximately ten (10) cuts on his arm and oblique, and six (6) of those cuts left permanent scars (Walker Decl. ¶ 14).

Prior to Inmate Battle's attack, Walker had witnessed other officers in Q-dormitory strip search inmates in preparation for an escort, and then walk away from the cells, leaving the inmates momentarily unsupervised in their cells (Third Amended Complaint at 7). Additionally, prior to the attack, Walker overheard inmates tell Ms. Hayes (the staff member who conducted group counseling), Sergeant Mason, and Officer Williamson that they (the inmates) were not attending group therapy because

other inmates had threatened to beat them up and stab them (Third Amended Complaint at 8).[3]

After Inmate Battle's attack, Walker heard Officer Williamson say, "Earlier in the morning before the incident happened, I heard Inmate Battle tell someone that he was going to beat someone up and there is going to be blood everywhere but I thought he was playing because I heard him laughing." (Walker Decl. ¶ 18).  Walker also heard Officer Williamson state he never performs pat searches because it is too much work (Walker Decl. ¶ 17).  Additionally, Officer Williamson told Inmate Dortanio Hughley, "In Q-dorm, we don't search inmates when they come out their [sic] cells, so over there you don't hear a lot of inmates arguing because they don't want to get stabbed up." (Hughley Decl.).

According to the FDOC's Management Information Notification System ("MINS"), which is the electronic reporting system where all incidents that occur in the FDOC are first reported, during the 3-year period prior to Inmate Battle's attack on Walker (November 25, 2011 to November 25, 2014), there were no incidents where an inmate housed at the Santa Rosa Annex brought a weapon from his cell to group counseling or recreation (Comerford Decl. ¶ 7).  During that same 3-year

---

[3] Defendants do not raise an evidentiary objection to this allegation.

Case No.:  3:15cv179/LAC/EMT

period, there were 3 incidents where an inmate housed at the Santa Rosa C.I.–Main Unit (not the Annex) brought a weapon from his cell to a dayroom or recreation (*see* Comerford Decl. ¶ 7, Attachs. 1–3).  Additionally, during 2014, there were 3,224 inmate-on-inmate batteries/assaults, with and without weapons, that occurred in all of the FDOC institutions, and only 6 of those incidents (or 0.19% (.0019)) occurred at the Santa Rosa Annex (Comerford Decl. ¶ 6).

V.    DISCUSSION

Because there is no dispute that Officer Williamson was "acting within the scope of his discretionary authority" in searching and securing inmates prior to escorting them to the dayroom for group counseling on November 25, 2014, the burden shifts to Walker to show that qualified immunity is not appropriate. *See* Lee, 284 F.3d at 1194.

Walker argues that Officer Williamson's failure to re-search Inmate Battle, after leaving Battle unsupervised for 2–3 minutes after Williamson strip searched him, and Officer Williamson's handcuffing Inmate Battle in front of his body instead of behind his back, constituted deliberate indifference to a substantial risk that Inmate Battle would attack him or another inmate during group counseling (Third Amended Complaint at 7, 9–10; Walker's Opposition to Defendants' Motion for Summary Judgment at 2–3).

A.     Did Officer Williamson's Conduct Violate Walker's Eighth Amendment Right?

Viewing the evidence in the light most favorable to Walker, there is insufficient evidence from which a trier of fact could reasonably infer that Walker faced a substantial risk or threat of being attacked by another inmate, including Inmate Battle, during group counseling.  Although the inmates in Q-dormitory suffered from mental illness, commonly cut themselves, and had behavioral problems, and inmates expressed fear of being beaten or stabbed by other inmates during group counseling, the evidence of inmate-on-inmate assaults involving weapons during group counseling or recreation does not indicate that inmates were "exposed to something even approaching the constant threat of violence."  There were zero incidents of such assaults during group counseling or recreation in the Santa Rosa Annex during the 3-year period prior to the assault on Walker, and of all of the inmate-on-inmates assaults/batteries (with and without weapons, and in all physical areas of FDOC institutions) that occurred in all of the FDOC institutions in 2014, only .0019 of them occurred at the Santa Rosa Annex.  The undersigned concludes, as a matter of law, that Walker did not face a substantial risk or threat of being attacked by another inmate, including Inmate Battle, during group counseling at the Santa Rosa Annex. *See, e.g.,* Harrison, 746 F.3d at 1299–30; Purcell, 400 F.3d at 1320–21.

Additionally, there is no evidence that Officer Williamson subjectively knew that Inmate Battle posed a substantial risk of serious harm to Walker or any other inmate. There is no evidence that Officer Williamson was aware of the pre-incarceration history between Walker and Inmate Battle. Further, although Officer Williamson allegedly overheard Inmate Battle say earlier that day that he was going to beat someone up and there was going to be blood everywhere, Battle was laughing when he said it, and Williamson subjectively believed that Battle was joking. Moreover, even if Officer Williamson was subjectively aware that Inmate Battle potentially posed a risk of serious harm to another inmate that day, Williamson took objectively reasonable measures to mitigate the risk that Battle would attack another inmate during group counseling. Officer Williamson followed the search and restraint policies and procedures in place at the time, including strip searching Inmate Battle in his cell and applying handcuffs with a waist chain and black box in front of Battle's body. There is no evidence that this search and restraint procedure had been ineffective in preventing attacks in the past. And although Williamson left Battle unsupervised for 2–3 minutes after the strip search and prior to removing Battle from his cell, after he was summoned by another officer, and then allowed Battle to be escorted to group counseling without re-searching him, Williamson's doing so reasonably suggests only negligence, not deliberate indifference. *See* <u>Brown</u>, 894

F.2d at 1537 ("The known risk of injury must be a strong likelihood, rather than a mere possibility before a correctional officer's failure to act can constitute deliberate indifference.").

B.      Was the Eighth Amendment Right Clearly Established at the Time of the Alleged Violation?

Walker cites Carter v. Galloway, 352 F.3d 1346 (11th Cir. 2003) and Goodman v. Kimbrough, 718 F.3d 1325 (11th Cir. 2013) as clearly establishing that Officer Williamson's conduct violated the Eighth Amendment (Walker's Opposition to Defendants' Motion for Summary Judgment at 5–6).

In Carter, Inmate Carter was placed, over his objection, in a cell with Inmate Barnes, "a close-security, Level 5 inmate." 352 F.3d at 1348. Barnes informed Carter that he intended to fake a hanging in order to obtain a transfer, and when Carter refused to assist Barnes in this endeavor, Barnes told Carter that he would help him "one way or another." *Id.* In addition to this verbal exchange, Barnes also "paced the cell like a caged animal" and "generally act[ed] in a disorderly manner." *Id.* (internal quotation marks omitted). Carter relayed this information to prison officials in an attempt to be removed from the cell he shared with Barnes, but no action was taken. *Id.* Roughly one week later, Barnes stabbed Carter in the stomach with a shank. *Id.* Carter then brought claims against the prison officials alleging that they had violated

the Eighth Amendment by allowing him to remain in the cell with Barnes, and the district court dismissed the claims on summary judgment.  *Id.*

On appeal, the Eleventh Circuit acknowledged that the prison officials were aware that "Barnes was a problem inmate with a well-documented history of prison disobedience and had been prone to violence" and that he was "acting crazy" and pacing his cell.  352 F.3d at 1349 (internal quotation marks omitted).  Nevertheless, the court explained that "before [a defendant's] awareness arises to a sufficient level of culpability, there must be much more than mere awareness of [an inmate's] generally problematic nature."  *Id.*  Although the prison officials possessed a "generalized awareness" of "Barnes's propensity for being a problematic inmate," without knowledge "of a particularized threat or fear," the Eleventh Circuit could not conclude that the officials actually drew the inference that Barnes posed a substantial risk of serious harm to Carter.  *Id.* at 1350.  The court therefore affirmed the district court's grant of summary judgment in favor of the prison officials.

In Goodman, pre-trial detainee Goodman, who suffered from dementia, sued Officers Boland and Feemster for failing to protect him from a severe beating by his cellmate.  Viewing the facts and taking all reasonable inferences in Goodman's favor, the Eleventh Circuit determined that the evidence showed that:  (1) Goodman and his attacker were housed in Section 6, a unit where inmates are housed out of concern for

their own safety or th safety of others; (2) Officer Boland and Officer Feemster failed to perform the required cell checks and the midnight head count in Section 6; (3) Feemster reported having completed the 6 p.m. head count even though he did not actually enter the cells in Section 6; (4) Inmate Toure told an "inmate worker," whom Boland had sent to Toure's cell to find out why he had pushed his emergency call button, that there was a fight in Goodman's cell; (5) Boland and Feemster deactivated emergency call buttons that evening without investigating the reason the buttons had been pressed; (6) three inmates, including Toure, heard sounds of violence emanating from Goodman's cell; and (7) despite claiming that she was swamped with inmates awaiting orientation, Boland took two lunch breaks and made a long visit to intake on the night Goodman was attacked. 718 F.3d at 1332.

The Eleventh Circuit held that Goodman had adduced no evidence that either Boland or Feemster was subjectively aware of the peril to which Goodman was exposed on the night in question. The court noted that although Goodman pointed to the officers' failure to conduct head counts and cell checks and their disengagement of the emergency call buttons in support of his assertions, the fact that the officers deviated from policy or were unreasonable in their actions—even grossly so—did not relieve Goodman of the burden of showing that the officers were subjectively aware of the risk:

[Goodman] cannot say, "Well, they should have known." Were we to accept that theory of liability, the deliberate indifference standard would be silently metamorphosed into a font of tort law—a brand of negligence redux—which the Supreme Court has made abundantly clear it is not. *See* Farmer, 511 U.S. at 838, 114 S. Ct. at 1979 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as [a constitutional violation]."); *see also* Paul v. Davis, 424 U.S. 693, 701, 96 S. Ct. 1155, 1160, 47 L. Ed. 2d 405 (1976) (noting "the constitutional shoals that confront any attempt to derive from congressional civil rights statutes a body of general federal tort law" (internal quotation marks omitted)).

Goodman, 718 F.3d at 1334. The Eleventh Circuit held that nothing in the record created a genuine issue of fact as to whether Officers Boland and Feemster were subjectively aware of a substantial risk of serious harm to Goodman; therefore, the officers were entitled to summary judgment on Goodman's failure-to-protect claims.

Neither Carter nor Goodman clearly established that Officer Williamson's conduct in this case violated the Eighth Amendment.

Additionally, the facts of this case are not materially similar to the facts of Eleventh Circuit cases which found Eighth Amendment violations with respect to prison officials' failure to protect inmates from attacks by other inmates. The undersigned will discuss five of those cases here.

In LaMarca v. Turner, the Eleventh Circuit determined that a prison official's failure to ensure adequate supervision and monitoring of inmates with a history of

inmate-on-inmate violence was a violation of the Eighth Amendment. 995 F.2d 1526, 1536–38 (11th Cir. 1993). In LaMarca, despite reported incidents of prior inmate-on-inmate violence, prison authorities did not station officers to patrol throughout the inmate dormitories, particularly at night. *Id.* at 1538. Prison authorities also allowed inmates to hang sheets, obstructing the guards' views, and preventing them from adequately supervising the inmates. *Id.* Thus, in LaMarca, there was an absence of adequate supervision despite a substantial risk of serious harm from inmate-on-inmate violence.

Similarly, in Hale v. Tallapoosa County, an inmate was assaulted by another inmate during the lengthy time between the jailer's scheduled rounds. 50 F.3d 1579, 1581 (11th Cir. 1995). The assault occurred despite past incidents of inmate-on-inmate violence because, other than making rounds, the jailer in Hale was "stationed out of eyesight and earshot" of the inmates. *Id.* at 1584. Based on these facts, the Eleventh Circuit recognized unconstitutional conditions of confinement existed because there was a lack of inmate supervision and a substantial risk of serious harm from known violent inmates.

In Cottone v. Jenne, Mr. Cottone was arrested and eventually "transferred from the Broward County Jail to Unit 1 of the North Broward Detention Center, which houses mentally ill inmates." 326 F.3d 1352, 1355 (11th Cir. 2003). Around the same

time, Mr. Charles also was arrested. *Id.* Prior to his arrest, Charles had been detained "on numerous occasions due to his violent tendencies and a history of schizophrenia," and "[w]hile in the booking area of the Broward County Jail . . ., Charles [had] struck another inmate." *Id.* at 1355–56. Several days later, Charles also was transferred to the North Broward Detention Center. *Id.* at 1356. Roughly a month after that, a staff psychiatrist determined that Charles was mentally stable, resulting in his placement in Unit 1 with Cottone and another inmate. *Id.* Although Unit 1 was divided into three separate cells, the cell doors were not locked, which allowed the three men to interact. *Id.* The following day, "[d]uring a schizophrenic episode, Charles allegedly strangled Cottone with shoelaces." *Id.* Cottone was transported to the North Broward Medical Center where he later died. *Id.*

On behalf of the estate, Cottone's father brought claims against the prison officials under § 1983, alleging that their "reckless indifference toward a substantial risk of serious inmate harm" had violated Cottone's Eighth Amendment right. 326 F.3d at 1356. The district court denied the prison officials' motion to dismiss, concluding that they were not entitled to qualified immunity, and the officials filed an interlocutory appeal. *Id.* at 1357. Affirming the district court's decision as to two prison guards, D'Elia and Williams, the Eleventh Circuit held:

Under the plaintiffs' version of the facts, the guards knew that Charles represented a substantial risk of serious harm because he was violent, out-of-control and in the throes of schizophrenia during his detention in Unit 1 prior to the murder incident.  D'Elia and Williams were assigned to supervise Charles as one of the mentally ill inmates in Unit 1, but did not do so.  Instead, they took consecutive breaks and watched video games.  Thus, just as there was no supervision of known violent inmates in LaMarca and Hale, in this case guards D'Elia and Williams did not monitor and supervise Charles, a known violent inmate who posed a substantial risk of serious harm to the other inmates.

326 F.3d at 1360.

Similarly, in Caldwell v. Warden, FCI Talladega, there was a known, violent inmate (Inmate Pinson) who was housed in a separate unit for violent and disruptive inmates and who had already threatened the safety of his cellmate (Plaintiff Caldwell) through the intentional and dangerous act of setting their shared, locked cell on fire. 748 F.3d at 1303.  And, almost immediately after Caldwell was rescued from that fiery cell, Caldwell specifically told the defendant prison officials that he feared that his life was in danger if he was returned to the locked cell with inmate Pinson.  *Id.* Armed with actual, subjective knowledge of inmate Pinson's prior violence before coming to the separate housing unit, inmate Pinson's recent violence against plaintiff Caldwell, and Caldwell's reported fear of being placed in a small, locked cell with inmate Pinson again, the defendants—like the defendants in Cottone—took no action. *Id.*  They did not investigate inmate Pinson's motives; they did not monitor inmate

Pinson's actions; they did not search the cell; and they did not take any other action to mitigate the substantial risk of serious harm that inmate Pinson posed to plaintiff Caldwell. *Id.* The Eleventh Circuit concluded that, when viewed in plaintiff Caldwell's favor, the facts showed that, shortly after extinguishing a sizeable cell fire, the defendants simply locked Caldwell back in the cell with inmate Pinson and walked away. *Id.* The Eleventh Circuit held that the defendants' total failure to investigate, or take any other action to mitigate—the substantial risk of serious harm that Pinson posed to Caldwell constituted unconstitutional deliberate indifference to Caldwell's Eighth Amendment rights. *Id.* Thus, the defendants were not entitled to qualified immunity at the summary judgment stage. *Id.*

In Rodriguez v. Sec'y for Dep't of Corr., the Eleventh Circuit held that the summary judgment evidence satisfied the subjective component of the Eighth Amendment standard with respect to Rodriguez's claims that Assistant Warden Kugler and Colonel Johnson failed to protect him from a stabbing by a member of the Latin Kings gang. 508 F.3d at 619, 621–22. The court held that the summary judgment evidence was sufficient to show that Assistant Kugler subjectively knew that Rodriguez faced a substantial risk of serious harm where on two occasions prior to the stabbing, Rodriguez verbally informed Kugler that he feared that a gang member may kill him based upon threats he had received, and Rodriguez requested either a transfer

from the institution or placement in protective custody. 511 F.3d at 618–19. With

respect to Colonel Johnson, the Eleventh Circuit held that the summary judgment

evidence was sufficient to show that Johnson subjectively knew that Rodriguez faced

a substantial risk of serious harm where Rodriguez told Johnson the following specific

information: (1) that he was a former Latin King who decided to renounce his

membership; (2) that members of the Latin Kings had threatened to kill him when he

returned to the compound in retaliation for his renunciation; (3) that the compound

was heavily populated with Latin Kings; and (4) that, in order to prevent an attempt

on his life, he needed either to be transferred to another institution or to be placed in

protective custody. *Id.* at 621–22. The Eleventh Circuit declined to address the

objective component of the Eighth Amendment claim, i.e., whether the defendant

prison officials responded reasonably to the known risk. 508 F.3d at 620, 622.

The facts of the instant case are not materially similar to the facts in LaMarca,

Hale, Cottone, Caldwell, or Rodriguez. Unlike those cases, it is undisputed here that

Defendant Officer Williamson took measures to mitigate any risk of harm that Inmate

Battle posed to other inmates in group counseling. Prior to Battle's escort to group

counseling, Officer Williamson strip searched and restrained Battle in accordance with

the institutional policies in place on November 25, 2014. There is no evidence that

those policies were previously ineffective in preventing inmate-on-inmate attacks with

weapons in the dayroom.  Walker argues that Williamson's protective measures were objectively unreasonable, because Williamson left Battle unsupervised for 2–3 minutes after the strip search, and then allowed Battle to exit his cell and go to group counseling without re-searching Battle.  However, no trier of fact could reasonably infer from the record evidence that Officer Williamson subjectively knew that there was a substantial risk, as opposed to a mere possibility, that Battle would arm himself during that 2–3 minute period.  According to Walker, other officers engaged in the same practices as Williamson.  Yet despite this practice, there is no evidence of a previous episode of an inmate-on-inmate attack with a weapon during group counseling or in the dayroom of the Santa Rosa Annex for at least 3 years prior to the attack on Walker.  Because Officer Williamson took objectively reasonable measures to mitigate any risk of harm that Battle posed to inmates in the dayroom, LaMarca, Hale, Cottone, Caldwell, or Rodriguez did not give Officer Williamson clear warning that his conduct was unconstitutional.  Therefore, Officer Williamson is entitled to qualified immunity on Walker's Eighth Amendment claim.

VI.     CONCLUSION

Viewing the evidence in the light most favorable to Walker, there is no genuine issue of material fact as to whether Officer Williamson's conduct with regard to his search and restraint of Inmate Battle on November 25, 2014, prior to Battle's escort

to the dayroom for group counseling, violated Walker's Eighth Amendment rights. Further, the state of the law on November 25, 2014, did not give Officer Williamson fair warning that the manner in which he searched and restrained Inmate Battle was unconstitutional. Therefore, Defendants' motion for summary judgment should be granted.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That Plaintiff's unopposed motion to voluntarily dismiss Defendants Comerford and Mason be **GRANTED**, and Defendants Comerford and Mason be **DISMISSED** from this lawsuit.

2.      That Defendants' motion for summary judgment (ECF No. 120) be **GRANTED** as to Defendant Williamson.

3.      That the clerk of court be directed to enter judgment accordingly and close the file.

At Pensacola, Florida, this 3ʳᵈ day of October 2017.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

Case No.:  3:15cv179/LAC/EMT

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>. A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**

Case No.:  3:15cv179/LAC/EMT